UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANDARIN ORIENTAL, INC.

Plaintiff,

v.

HDI GLOBAL INSURANCE COMPANY and
ASSICURAZIONI GENERALI S.p.A.,

Defendant.

CIVIL ACTION NO. 23 Civ. 4951 (JPC) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

In this insurance coverage dispute arising out of the COVID-19 pandemic, now before the Court is the motion of Plaintiff Mandarin Oriental, Inc. ("Mandarin") to compel two of its insurers, Defendants HDI Global Insurance Company ("HDI") and Assicurazioni Generali S.p.A. ("Generali", with HDI, "Defendants") to produce certain documents Defendants have withheld as privileged. (ECF No. 59 (the "Motion")).  Following an in camera review of ten exemplar documents (the "Exemplars"), and a conference with the parties, and for the reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## II. BACKGROUND

The factual and procedural background of this action is set forth in the Opinion and Order the Honorable John P. Cronan issued on September 19, 2024 denying Defendants' motion to dismiss Mandarin's breach of contract claim (Count II) and sua sponte dismissing Mandarin's declaratory judgment claim (Count I).  See Mandarin Oriental, Inc. v. HDI Global Ins. Co., No. 23 Civ. 4951 (JPC), 2024 WL 4252562, at *1–2 (S.D.N.Y. Sept. 19, 2024).  We incorporate that background by reference, continue the use of defined terms, and set forth only the additional background necessary to decide the Motion.

A. **Factual Background**

Mandarin operates, as is relevant here, hotels in Miami, New York, Washington, DC, and Boston (the "Hotels"). (ECF No. 1 ¶ 2). "Mandarin purchased 'all risks' commercial lines insurance policies from a group of insurers that included HDI and Generali, under which the insurers had quota share percentages of coverage." Mandarin Oriental, 2024 WL 4252562, at *1.[1] The coverage period under the HDI policy was May 1, 2018 until May 1, 2020, and under the Generali policy was May 1, 2016 through May 1, 2021 (the HDI policy and the Generali policy together, the "Policies"). Id. "Both [P]olicies contained Endorsement No. 3, which provided coverage for certain special perils[,]" including "loss resulting from interruption of or interference with the business carried on by [Mandarin] in consequence of: (a) Infectious or contagious disease manifested by any person while on the premises of [Mandarin] or within a radius of 5 miles thereof." Id. (quoting ECF No. 1 ¶ 16). Endorsement No. 3 required Mandarin to file any claim for coverage within:

> such length of time as would be required with the exercise of due diligence and dispatch to restore [its] business to the condition that would have existed had no loss occurred and shall include the time required to make the premises conform to the order of a competent public authority, subject to any Period of Recovery stipulated in the policy and beginning with the interruption or interference with the business.

Id. (quoting ECF No. 1 ¶ 17). "Endorsement No. 3 has a $10 million per occurrence sublimit, which Mandarin contends 'separately applies at each of Mandarin's four separate hotel premises.'" Id. (quoting ECF No. 1 ¶ 17).

---

[1] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.

In this action, Mandarin alleges that the Hotels "were impacted by the COVID-19 pandemic and the attendant manifestations of COVID-19 by any person within a 5-mile radius of each of those hotels." (ECF No. 1 ¶ 25). "The first COVID-19 manifestation in someone within a five-mile radius of each of those hotels occurred between February and March 2020, depending on the hotel." Mandarin, 2024 WL 4252562, at *2. Mandarin claims to have suffered tens of millions of dollars in business interruption losses at the Hotels due to COVID-19. Id. (See ECF Nos. 1 ¶¶ 30–34; 59 at 1). Mandarin seeks to hold HDI and Generali liable under the Policies for their respective 25% and 10% shares of the $10 million sublimit for each occurrence. (ECF No. 59 at 1).

On March 24, 2020, Mandarin first notified Defendants that it was asserting claims under the Policies for the business interruption losses at the Hotels. (ECF Nos. 1 ¶ 36; 59 at 1; 62 at 1). To adjust Mandarin's claims, Defendants hired McLarens as an independent adjuster and J.S. Held as a forensic accountant. (ECF No. 62 at 1). Defendants contend that fact discovery has shown that McLarens and J.S. Held collected and analyzed factual data, and Zelle LLP ("Zelle") was counsel for and provided legal advice to Defendants. (Id.)

On June 1, 2020, Defendants issued—through McLarens—notifying Mandarin that they planned to "investigate th[e] claim under a full reservation of rights[.]" (ECF No. 62-3 at 2). Throughout 2020, the parties corresponded about Mandarin's claims, with Defendants making several information requests, to which Mandarin responded. (ECF Nos. 1 ¶¶ 37, 43; 59 at 1). The parties dispute whether Mandarin's responses were sufficient. (Compare ECF No. 59 at 1 with ECF No. 62 at 1–2; see ECF No. 67). To date, Defendants have not provided Mandarin with a

formal coverage opinion (outside the mediation context), (ECF No. 59 at 2), but have "set reserves . . . based on legal advice regarding potential exposure[.]"  (ECF No. 62 at 2).

**B.  Procedural Background**

After denying Defendants' motion to dismiss, see Mandarin Oriental, 2024 WL 4252562, Judge Cronan referred the matter to the undersigned for general pretrial supervision, and the parties began fact discovery, with a deadline of May 30, 2025, later extended to June 30, 2025. (ECF Nos. 38; 46; 58).  During discovery, Defendants withheld from production as privileged approximately 500 documents, which they recorded on four privilege logs, one each for Generali, HDI, McLarens, and J.S. Held.  (ECF No. 67 at 6; see ECF Nos. 59-3; 59-4; 59-5; 59-6).

Following a conference with the parties on April 7, 2025, during which Mandarin indicated its intent to seek to compel Defendants to produce certain documents they withheld as privileged, the Court ordered the parties to meet and confer to identify the Exemplars and set a briefing schedule for the Motion.  (ECF No. 58).  On April 18, 2025, Mandarin filed the Motion, on April 25, 2025, Defendants filed an opposition, and on April 30, 2025, Mandarin filed a reply.  (ECF Nos. 59; 62; 64).  On May 21, 2025, the Court held a conference with the parties to discuss the Motion (ECF No. 63; see ECF min. entry dated May 21, 2025), following which, at the Court's direction, Defendants provided the Court with translations of foreign language portions of the Exemplars.  (See ECF No. 67 at 26–27).

### III.DISCUSSION

**A. Legal Standards**

    **1. Federal Rule of Civil Procedure 26**

Federal Rule of Civil Procedure 26 permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

"Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004). The party seeking discovery bears the burden to demonstrate relevance, after a showing of which "it is up to the responding party to justify curtailing discovery." Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 284 F.R.D. 132, 135 (S.D.N.Y. 2012). In the insurance context, "[r]elevance of reserve information is evaluated on a case-by-case basis." 99 Wall Dev. Inc. v. Allied World Specialty Ins. Co., No. 18 Civ. 126 (RA) (KHP), 2019 WL 2482356, at *4 (S.D.N.Y. June 14, 2019). In this District, courts "have found reserve information relevant where bad faith has been alleged." Id.; see 866 E. 164th St., LLC v. Union Mut. Fire Ins. Co., No. 16 Civ. 3678 (SN), 2016 WL 6901321, at *2 (S.D.N.Y. Nov. 23, 2016) (deeming reserve changes during investigation relevant to question whether defendant improperly denied plaintiff's claim); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. H&R Block, Inc., No. 12 Civ. 1505 (AT) (HBP), 2014 WL 4377845, at *4 (S.D.N.Y. Sept. 4, 2014) (finding information about establishment of reserve relevant and discoverable where insured alleged bad faith refusal

to pay); Fireman's Fund284 F.R.D. at 139 (requiring insurer to produce reserve information as relevant to insurer's "own beliefs about coverage and their liability"). A case-by-case approach also applies to the relevance of reinsurance information. See 99 Wall Dev., 2019 WL 2482356, at *5.

### 2. The Privileges

#### a. Attorney-Client Privilege

"The attorney-client privilege [ACP] is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Under federal law, the attorney-client privilege applies only if all the following are met:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441 (S.D.N.Y. 1995) (quoting United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358–59 (D. Mass. 1950)). Under New York law, for the privilege to apply, the communication must have been made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 377–78 (1991). The communication must also "be primarily or predominantly of a legal character." Id. at 378. In evaluating whether the privilege applies, the "critical inquiry" is "whether, viewing the lawyer's

communication in its full content and context, it was made in order to render legal advice or services to the client." Id. at 379.

The party invoking the attorney-client privilege bears the burden of demonstrating that the privilege applies.  See In re Grand Jury Proc., 219 F.3d 175, 182 (2d Cir. 2000) ("In re Grand Jury I"); United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995) ("Adlman I"); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470–71 (S.D.N.Y. 1993); Spectrum, 78 N.Y.2d at 377.  To meet this burden, the party asserting the attorney-client privilege must show that the communications were "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." Brennan Ctr. for Just. at N.Y.U. v. U.S. Dep't of Just., 697 F.3d 184, 207 (2d Cir. 2012).  This burden is "not discharged by mere conclusory or ipse dixit assertions."  In re Grand Jury Subpoenas dated Jan. 4, 1984, 750 F.2d 223, 225 (2d Cir. 1984).  "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege."  Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).  As this Court has explained, "the privilege attaches not only to communications by the client to the attorney, but also to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client."  In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig., No. 14 MD 2542 (VSB) (SLC), 2020 WL 8465433, at *2 (S.D.N.Y. Oct. 30, 2020) (quoting Bank Brussels, 160 F.R.D. at 441–42).

The mere fact, however, that a document was transmitted between an attorney and a client does not render the document privileged.  See Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.), 139 F.R.D. 295, 300 (S.D.N.Y. 1991).   Rather, it "must contain confidential

communication relating to legal advice." Id.; see Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 1356192, at *1 (S.D.N.Y. Nov. 2, 2001) (rejecting argument that "any reference to any communication between [a client] and one of his attorneys on any document shields that entire document from disclosure, whether or not the document reveals communications made by [the client] to his attorneys in confidence and for the purpose of obtaining legal advice").  Conversely, "the mere fact that a document contains some public or nonconfidential information does not necessarily make the document discoverable." Astra Aktiebolag v. Andrx Pharm., Inc., 208 F.R.D. 92, 103 (S.D.N.Y. 2002).  Similarly, "just as facts cannot be invested with privilege merely by communicating them to an attorney, so [too] the confidentiality of the communication is not [necessarily] destroyed by disclosure of the underlying facts."  Solomon v. Sci. Am., Inc., 125 F.R.D. 34, 37 (S.D.N.Y. 1988).

"The attorney-client privilege was designed 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and [the] administration of justice.'"  TVT Recs. v. Island Def Jam Music Grp., 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (quoting Upjohn, 449 U.S. at 389).  "Because the privilege 'stands in derogation of the public's right to every [person]'s evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" TVT Recs., 214 F.R.D. at 144 (quoting In re Grand Jury I, 219 F.3d at 182); see Brown v. Barnes and Noble, Inc., 474 F. Supp. 3d 637, 648 (S.D.N.Y. 2019) ("The privilege is narrowly construed because it renders relevant information undiscoverable."); accord Coventry Cap. US LLC v. EEA Life Settlements Inc., No. 17 Civ. 7417 (VM) (SLC), 2021 WL 4312026, at *2 (S.D.N.Y. Sept. 22, 2021).

Finally, "[i]t is well-established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship." Denney v. Jenkens & Gilchrist, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004). Thus, the party invoking the attorney-client privilege must also show "'that the communications between client and attorney were made in confidence and have been maintained in confidence.'" Id. (quoting In re Horowitz, 482 F.2d 72, 81–82 (2d Cir. 1973)).

### b.  Work-Product Protection

"Federal law governs the applicability of the work product doctrine in all actions in federal court." Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015). "[D]ocuments and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" are eligible for work-product protection. Fed. R. Civ. P. 26(b)(3)(A). For the work-product protection ("WPP") to apply, the party claiming protection bears the burden of establishing "that the material at issue '(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by [its] representative.'" Pilkington N. Am., Inc. v. Mitsui Sumimoto Ins. Co. of Am., 341 F.R.D. 10, 13 (S.D.N.Y. 2022) (quoting Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)).

In response to a challenge to the work-product protection, the party asserting the protection must "submit evidence, by way of affidavit, deposition testimony or otherwise, establishing only the challenged elements of the applicable privilege or protection, with the ultimate burden of proof resting with the party asserting the privilege or protection." A.I.A.

Holdings, S.A. v. Lehman Bros., Inc., No. 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824, at *6 (S.D.N.Y. Oct. 21, 2002), supplemented by, 2002 WL 31556382 (S.D.N.Y. Nov. 15, 2002); see Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB) (HBP), 2007 WL 473726, at *4 (S.D.N.Y. Feb. 14, 2007) ("The party asserting the protection of the work-product doctrine bears the burden of proof."). The party asserting the protection can meet this burden "only by an evidentiary showing based on competent evidence . . . and [it] cannot be 'discharged by mere conclusory or ipse dixit assertions.'" Bowne, 150 F.R.D. at 470 (quoting von Bulow v. von Bulow, 811 F.2d 136, 146 (2d Cir. 1987)).

Concerning the second prong, "[i]n anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) ("Adlman II"). "Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings." Schaeffler v. United States, 806 F.3d 34, 43 (2d Cir. 2015). But "[d]ocuments prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity." In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 221 (S.D.N.Y. 2001). A party's "consider[ation of] the possibility of litigation . . . is insufficient to trigger the protection of the work product doctrine[.]" Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 75 (S.D.N.Y. 2010); see Kingsway, 2007 WL 473726, at *5 (collecting cases); In re Grand Jury Proc., No. M-11-189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) ("In re Grand Jury II") (explaining that "a generalized desire to avoid litigation is insufficient to meet the 'in anticipation of litigation' requirement"). "Rather, the party must have taken 'affirmative steps

10

in anticipation of litigation.'" Brook v. Simon & Ptrs., LLP, No. 17 Civ. 6435 (GBD) (SLC),

2021 WL 5919207, at *4 (S.D.N.Y. Dec. 15, 2021) (quoting Gucci, 271 F.R.D. at 75).

In contrast to the attorney-client privilege, "the protection afforded work product is not

waived merely because the material is disclosed to a third party." Bank of Am., N.A. v. Terra Nova

Ins. Co., 212 F.R.D. 166, 169 (S.D.N.Y. 2002). A party does, however, "waive[] the work product

protection by taking actions inconsistent with . . . its purpose, such as disclosing work product to

its adversary, or by placing privileged documents 'at issue' in a litigation[.]" N.Y. Times Co. v. U.S.

Dep't of Just., 939 F.3d 479, 494 (2d Cir. 2019). "[C]ourts find that the work-product privilege is

waived only if disclosure to the third party 'substantially increases the opportunity for potential

adversaries to obtain the information.'" Cellco P'ship d/b/a Verizon Wireless v. Nextel Commc'n,

Inc. No. 03 Civ. 725 (KAJ) (RO), 2004 WL 1542259, at *1 (S.D.N.Y. July 9, 2004) (quoting In re Grand

Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)).

The work-product protection is not absolute, however. "A finding that a document was

prepared 'because of the prospect of litigation . . . does not necessarily mean that the document

will be protected against discovery,' but instead that the 'document is eligible for work-product'

protection." Brook, 2021 WL 5919207, at *5 (quoting Adlman II, 134 F.3d at 1202–03). Pursuant

to Federal Rule of Civil Procedure 26(b)(3)(A), "work product materials are discoverable if (i) they

are otherwise discoverable under Rule 26(b)(1), and (ii) the party seeking them shows that it has

substantial need for the materials to prepare its case and cannot, without undue hardship, obtain

their substantial equivalent by other means." Rackwise, Inc. v. Foley Shechter Ablovatskiy, LLP,

No. 19 Civ. 11094 (AT) (SLC), 2020 WL 7342743, at *8 (S.D.N.Y. Dec. 14, 2020) (citing Fed. R. Civ.

P. 26(b)(3)(A)). "A substantial need exists 'where the information sought is essential to the

11

party's defense, is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative values on contested issues.'" Gucci, 271 F.R.D. at 74–75 (quoting Nat'l Cong. for Puerto Rican Rts. v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)). "Even when a showing of substantial need has been made, the court must 'protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'" Brook, 2021 WL 5919207, at *5 (quoting Fed. R. Civ. P. 26(b)(3)(B)).

### B. Application

As Mandarin sees it, this action focuses on four disputed issues: "(1) what triggers coverage under the Policies' special perils endorsement; (2) the number of occurrences that constitute Mandarin's claims; (3) the applicable period of recovery; and (4) whether Defendants' adjusted Mandarin's claim in bad faith." (ECF No. 59 at 2). In the Motion, Mandarin challenges three aspects of Defendants' assertion of the Privileges, arguing that they have improperly withheld (i) reinsurance information, (ii) reserve information, and (iii) other documents under the ACP. (Id.). We consider each in turn.

#### 1. Reinsurance Information

In Mandarin's first set of document requests to Defendants, it requested "[a]ll communications and documents concerning reinsurance for Mandarin's claims under the policies." (ECF No. 59-2 at 12 ("Request 12")). In response to Request 12, Defendants produced their claim and underwriting files, which included references to reinsurance contracts, but have represented that "[t]here were no communications with reinsurers[,]" (ECF No. 67 at 37), and that they "have not withheld any reinsurance communications." (ECF No. 62 at 5). Nevertheless,

Defendants are "doing additional searches" for communications relating to reinsurance, and if so, will determine whether one of the Privileges applies, and thus assert that there is no ripe issue concerning reinsurance communications. (ECF No. 67 at 37). Mandarin disagrees, asserting that Defendants have indicated that they will refuse to produce any reinsurance communications and therefore, ask the Court to find that such communications are relevant and not privileged. (ECF No. 64 at 2).

As noted above, "the relevance of reinsurance information is determined on a case-by-case basis[,]" but "[m]ost courts to address the issue have found that reinsurance information is relevant." 99 Wall Dev., 2019 WL 2482356, at *5; see Fireman's Fund, 284 F.R.D. at 137. Defendants do not really explain why reinsurance communications are irrelevant—indeed, their admission that they have already produced some information about reinsurance policies undercuts any assertion that communications about those policies are irrelevant. In addition, Mandarin persuasively argues that Defendants' communications with reinsurers could "shed light on Defendants' internal evaluations of their own coverage obligations"—i.e., differences between those internal assessments and what Defendants communicated to Mandarin, are relevant to Mandarin's assertion that "Defendants adjusted Mandarin's position in bad faith." (ECF No. 59 at 2; see ECF No. 1 ¶¶ 61-67 (alleging that Defendants breached the covenant of good faith and fair dealing by unreasonably denying Mandarin's claim)).

As other courts in this District have recognized, Defendants' communications with their reinsurers could reflect Defendants' understanding of the risk that Mandarin's claims posed, the merits of Mandarin's claims, and the likelihood of coverage. See Fireman's Fund, 284 F.R.D. at 138 (finding reinsurance information relevant); Stonewall Ins. Co. v. Nat'l Gypsum Co., No. 86 Civ.

9671 (SWK), 1988 WL 96159, at *5–6 (S.D.N.Y. Sept. 6, 1988) (permitting discovery of reinsurance information).  Finally, we are also cognizant of "the broad scope of discovery permitted by Rule 26," particularly given the paucity of Defendants' arguments against a finding of relevance.

Accordingly, to the extent that Defendants' continued searches locate any communications with their reinsurers responsive to Request 12, the Court overrules Defendants' relevance objection and directs Defendants to produce those communications unless another viable ground for withholding, such as privilege, exists.

### 2. Reserve Information

#### a. Relevance

Defendants also mount a relevance objection to producing information about reserves, suggesting that "'the establishment of a reserve may merely reflect a prudent insurer's recognition of the risks [] inherent in litigation rather than an admission of coverage or liability.'" (ECF No. 62 at 5 (quoting Nat'l Union Fire Ins., 2014 WL 4377845, at *3).  Mandarin responds that where, as here, there is evidence that insurers have refused in bad faith to advance coverage under a valid insurance policy, courts have found that reserve information has "probative value." (ECF No. 59 at 3).  Mandarin anticipates that reserve information "may provide valuable, relevant insight into" Defendants' "'own beliefs about coverage and their liability,'" and therefore, what they knew about the risks of insuring Mandarin.  (ECF No. 59 at 3 & n.16 (quoting Fireman's Fund, 284 F.R.D. at 139)).

As with reinsurance communications, Mandarin has the better of the argument.  As noted above, Mandarin has alleged that Defendants' have breached the covenant of good faith and fair dealing in failing to provide a coverage position or advance payment under the Policies, and

therefore, reserve information is relevant to assessing Defendants' motivations.  See 99 Wall Dev., 2019 WL 2482356, at *4 (finding reserve information relevant and discoverable as to bad faith allegations); Nat'l Union Fire Ins., 2014 WL 4377845, at *5 (finding reserve information "sufficiently relevant to be discoverable"); Fireman's Fund, 284 F.R.D. at 139 (finding reserve information relevant to insurers' knowledge of risks and state of mind in denying coverage).

Accordingly, the Court overrules Defendants' relevance objection to the production of reserve information and directs Defendants to produce documents containing reserve information unless another viable ground for withholding, such as privilege, exists.

**b.  Privilege**

Defendants contend that, even if relevant, "reserve information may be protected by the [ACP] and [WPP]."  (ECF No. 62 at 5).  Apart from several case citations,[2] Defendants' only support for this argument is the conclusory assertion that "the reserves methodology incorporated legal advice, potential litigation risk, and information gained during protected settlement negotiations."  (Id.)  Mandarin responds that Defendants' assertion of privilege over reserve information "only further prove[s] that Defendants' counsel did ordinary claim adjustment work, including the setting of reserves[,]" and that therefore, the reserve information is not privileged and discoverable.  (ECF No. 64 at 2).

As an initial matter, Defendants' conclusory assertions of privilege, unsupported by any evidence, such as an attorney declaration or deposition testimony explaining why the ACP or

---

[2] Defendants cite Lava Trading, Inc. v. Hartford Fire Ins. Co., No. 03 Civ. 7037 (PKC) (MHD), 2005 WL 66892 (S.D.N.Y. Jan. 11, 2005), In re Pfizer Inc. Secs. Litig., No. 09 Civ. 1260 (SS) (NRB), 1994 WL 263610 (S.D.N.Y. June 6, 1994), and Sundance Cruises Corp. v. Am. Bureau of Shipping, No. 87 Civ. 819 (WK) (SEG), 1992 WL 75097 (S.D.N.Y. Mar. 31, 1992).  (ECF No. 62 at 5).

WPP applies, fail to satisfy their burden to establish that reserve information should be protected from discovery.  See A.I.A. Holdings, S.A., 2002 WL 31385824, at *6 (explaining that party asserting WPP must submit evidence to establish challenged elements); Bowne, 150 F.R.D. at 470 (explaining that party asserting WPP must make "evidentiary showing based on competent evidence"); see also In re Grand Jury Subpoenas dated Jan. 4, 1984, 750 F.2d at 225 (explaining that conclusory assertions do not satisfy party's burden to establish ACP).  Defendants simply ask the Court to "take their word" that the reserve information is privileged, and for that reason, have not met their burden.  See Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09 Civ. 3312 (PKC) (VMS), 2014 WL 12833780, at *12–18 (E.D.N.Y. Apr. 11, 2014) (holding that insurance company failed to meet burden of establishing that reserve documents were created in anticipation of litigation); see also Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 109 (S.D.N.Y. 2007) (holding that party failed to establish WPP where it did not "provide a witness to attest to the question of what [the party] would have done had there been no threat of litigation"); OneBeacon Ins. Co. v. Forman Int'l, Ltd., No. 04 Civ. 2271 (RWS), 2006 WL 3771010, at *6 (S.D.N.Y. Dec. 15, 2006) (finding that party's "unsworn statements in legal memoranda" did not satisfy burden to establish privilege); cf. Lava Trading, Inc., 2005 WL 66892, at *3 (holding that even if reserve information might "normally" be subject to WPP, defendant "fail[ed] to satisfy the requirements of the caselaw for protection").

Furthermore, based on our in camera review, the two Exemplars discussing reserves for Mandarin's claims do not on their face establish that they are privileged.[3]  First, "New York law requires insurers to set reserves for losses and loss expenses", so Defendants' establishment of

---

[3] Exemplar 2 (HDI002176-78) and Exemplar 5 (Generali000281-298).  (See ECF No. 67 at 19–20.)

reserves based on their investigation of Mandarin's claims occurred in the ordinary course of business irrespective of any prospect of litigation as is required for WPP to apply. Safeco Ins. Co., 2014 WL 12833780, at *14 (citing N.Y. Ins. L. § 4117(b)(1)); see 99 Wall Dev., 2019 WL 2482356, at *5 (noting that "[t]he factual level of the reserve is not privileged and . . . is a business judgment and a requirement of New York law"). Second, both Exemplars are dated more than a year before this action commenced, reinforcing that these communications were in the ordinary course of Defendants' process of adjusting Mandarin's claims, not in anticipation of litigation. See OneBeacon Ins. Co., 2006 WL 3771010, at *5 (collecting cases recognizing that documents prepared in ordinary course of insurer's process of investigating and adjusting claims are not subject to WPP). Finally, with respect to ACP, while Defendants' outside counsel, Paul Sullivan, Esq., is involved in some of the emails redacted from Exemplar 5, his involvement alone does not render the communications privileged, especially where they do not appear to contain information exchanged between client and counsel "that was intended to be maintained in confidence." 99 Wall Dev., 2019 WL 2482356, at *5; see Brooklyn Union Gas Co. v. Am. Home Assur. Co., 23 A.D.3d 190, 191 (1st Dep't 2005) (explaining that "[d]ocuments prepared in the ordinary course of an insurance company's investigation to determine whether to accept or reject coverage and to evaluate the extent of a claimant's loss . . . do not become privileged merely because [such] an investigation was conducted by an attorney").

Accordingly, the Court finds that Defendants have failed to establish that documents reflecting reserve information or communications about reserves are protected by ACP or WPP.

### 3. **Mandarin's Remaining Objections to Defendants' Privilege Assertions**

Mandarin also objects to Defendants' assertion of privilege over (i) communications and documents exchanged with their adjusters, McLaren's, and outside accountants, J.S. Held, without attorneys present on the communication, and (ii) communications and documents among non-attorney employees of HDI and Generali. (ECF No. 59 at 4). Mandarin's arguments appear to pertain to Exemplars 6, 7, 8, 9, and 10.[4] (ECF No. 67 at 17–19). Defendants respond that McLaren's and J.S. Held, not Mr. Sullivan at Zelle, investigated Mandarin's claim, and that Mr. Sullivan's role "was providing legal advice to HDI and Generali[.]" (ECF No. 62 at 4).

Once again, Defendants' unsworn assertions in their opposition letter are underwhelming in establishing privilege. See OneBeacon Ins. Co., 2006 WL 3771010, at *6. Nevertheless, we have individually reviewed each of the Exemplars and set forth below our conclusion as to each.

### a. **Exemplar 6**

Exemplar 6[5] is a series of emails, the first five of which Defendants have redacted as protected by the ACP, in September 2020 between representatives of HDI and Generali, outside counsel including Mr. Sullivan, and Rocco Bianchi, a Senior Executive General Adjuster at McLaren's, discussing Mandarin's claims under the Policies.

Taking the emails in chronological—i.e., reverse—order, the first email is from Mr. Bianchi to Mr. Sullivan and two other outside counsel dated September 15, 2020 forwarding an email to Mandarin requesting additional information for the claims investigation and asking the recipients to share this status with their clients (the "Sept. 15 Bianchi Email"). Mr. Bianchi is relaying a non-

---

[4] HDI001060-65, HDI001237-40, HDI00196-99, Generali000633-40, and Generali000165-68, respectively.
[5] HDI001060-65.

confidential communication with outside parties—i.e., Mandarin—to Defendants' outside counsel. There is no indication that Mr. Bianchi is soliciting legal advice, nor any indication that the contents of his message are confidential. Accordingly, the ACP does not protect this email from disclosure. In addition, given the date of this email, it was prepared in the ordinary course of Defendants' investigation of Mandarin's claims, not in anticipation of litigation, and therefore is not protected by the WPP. Accordingly, Defendants are directed to unredact and produce the Sept. 15 Bianchi Email.

The second email is a September 16, 2020 message from Mr. Sullivan forwarding to HDI and Generali the Sept. 15 Bianchi Email and proposing times for a call to discuss it (the "Sept. 16 Sullivan Email"). Mr. Sullivan's message does not contain any legal advice, nor, given the timing, was it prepared in anticipation of litigation, so it is not protected by the ACP or the WPP. Accordingly, Defendants are directed to unredact and produce the Sept. 16 Sullivan Email.

The third email is a September 16, 2020 message from Joseph Kearney at HDI responding to the Sept. 16, 2020 Sullivan Email regarding his availability for a call with Mr. Sullivan (the "Sept. 16 Kearney Email"). Mr. Kearney's message does not solicit any legal advice, nor, given the timing, was it prepared in anticipation of litigation, so it is not protected by the ACP or the WPP. Accordingly, Defendants are directed to unredact and produce the Sept. 16 Kearney Email.

The fourth email is a September 17, 2020 message from Hugo Porpora at Generali to Mr. Sullivan and Mr. Kearney providing his availability for a call, but also soliciting legal advice from Mr. Sullivan. Because this message contains a request for legal advice from Mr. Sullivan, it is protected by the ACP and is properly redacted. See 99 Wall Dev., 2019 WL 2482356, at *5 (finding

that document containing request for counsel's legal assessment of claims was protected by ACP and/or WPP and did not need to be produced).

The fifth email is a September 17, 2020 message from Mr. Sullivan to Mr. Porpora summarizing his legal advice regarding Mandarin's claim. Because this message contains Mr. Sullivan's legal advice, which Mr. Porpora had requested, it is protected by the ACP and is properly redacted. See Id.

Accordingly, with respect to Exemplar 6, Defendants are directed to unredact and produce the Sept. 15 Bianchi Email, the Sept. 16 Sullivan Email, and the Sept. 16 Kearney Email.

### b. Exemplar 7

Exemplar 7 is a series of emails in December 2021 between individuals at Generali, Mr. Sullivan, and other attorneys at Zelle, from which Defendants have redacted the first two emails as protected by the ACP.[6]

Taking the emails in chronological—reverse—order, the first email is a December 1, 2021 message from Art Brown at HDI to Mr. Sullivan and others attaching and soliciting comments on an updated draft of a request to be sent to Mandarin for additional information about its claim under the Policies (the "Dec. 2021 Brown Email"). Even if one possible reading of the Dec. 2021 Brown Email is as a solicitation for legal advice, nothing in this message appears to be confidential information communicated by a client to an attorney that was intended to remain confidential. And, even if the message reflected comments from Mr. Sullivan—which it does not—"the mere fact that an attorney prepared a [document] does not make it privileged." 99 Wall Dev. Inc., 2019 WL 2482356, at *5. In addition, nothing about the timing of the Dec. 2021 Brown Email—more

---

[6] HDI001237-40.

than 18 months before Mandarin filed this action—indicates that it was prepared in anticipation of litigation; rather, the message was sent in connection with Defendants' efforts to investigate Mandarin's claim.  Thus, neither the ACP nor the WPP apply.

The second email is a December 2, 2021 message from David Lammond responding to Mr. Brown, copying Mr. Sullivan and others at Generali and Zelle, with his reaction to the draft request to Mandarin for more information (the "Dec. 2021 Lammond Email").  Mr. Lammond is responding to Mr. Brown about a communication to a third party—Mandarin—so this message does not reflect any confidential information communicated by a client to an attorney for purposes of soliciting or rendering legal advice.  In addition, nothing about the timing of the Dec. 2021 Lammond Email indicates that it was prepared in anticipation of litigation.  Thus, neither the ACP nor the WPP apply.

Accordingly, with respect to Exemplar 7, Defendants are directed to unredact and produce the Dec. 2021 Brown Email and the Dec. 2021 Lammond Email.

### c.  Exemplar 8

Exemplar 8 is a series of emails in May 2022 between individuals at HDI, Generali, and Mr. Sullivan concerning communications with Marsh, Mandarin's broker, from which Defendants have redacted the first email, dated May 10, 2022 from Mr. Brown to Mr. Sullivan and Mr. Lammond (the "May 2022 Brown Email").[7]  In the May 2022 Brown Email, Mr. Brown summarizes a conversation with Marsh regarding a request for additional information from Mandarin and invites Mr. Sullivan and Mr. Lammond to participate in a call to discuss.  Even if one possible reading of the May 2022 Brown Email was a solicitation for legal advice from Mr. Sullivan, this

---

[7] HDI000196-99.

message describes a conversation with a third party—Marsh—and thus by its nature does not contain information that was intended to remain confidential.  Coming almost a year before Mandarin filed this action, it also does not appear to have been prepared in anticipation of litigation.  Thus, neither the ACP nor the WPP apply.

Accordingly, with respect to Exemplar 8, Defendants shall unredact and produce the May 2022 Brown Email.

### d.  Exemplar 9

Exemplar 9 is a series of emails between December 2020 and April 2021 between Mr. Sullivan and individuals at HDI and Generali regarding Mandarin's claim, from which Defendants have redacted eleven emails as protected by ACP.[8]  Taking the emails in chronological—reverse— order, the first email is a December 8, 2020 message from Mr. Kearney (HDI) to Mr. Sullivan and another attorney at Zelle forwarding a message from Marsh, Mandarin's broker (the "Dec. 2020 Kearney Email").  Even if Mr. Kearney was implicitly requesting legal advice from Zelle, there is nothing about the Dec. 2020 Kearney Email that reflects a communication from a client to an attorney that was intended to be confidential.  Given the timing of the Dec. 2020 Kearney Email, it was not prepared in anticipation of litigation.  Thus, neither the ACP nor the WPP apply.

The second and third emails are Mr. Sullivan's response to the Dec. 2020 Kearney Email and proposing times for a call to discuss a draft letter to Marsh (the "Dec. 2020 Sullivan Emails").  Nothing about the Dec. 2020 Sullivan Emails reflect a communication from an attorney to a client that was intended to be confidential; indeed, they summarize conversations with Mandarin's

---

[8] Generali000633-40.

other insurers.  Given the timing of the Dec. 2020 Sullivan Emails, they were not prepared in anticipation of litigation.  Thus, neither the ACP nor the WPP apply.

The fourth and fifth emails are Mr. Kearney's and Mr. Porpora's responses to the Dec. 2020 Sullivan Emails approving the draft letter to Marsh and discussing Mr. Sullivan's legal advice.  Accordingly, these messages are protected by the ACP and are properly redacted.  See 99 Wall Dev. Inc., 2019 WL 2483256, at *5.

The sixth, seventh, eighth, ninth, tenth, and eleventh emails are dated between January 18, 2021 and April 28, 2021 and are between Mr. Sullivan, Mr. Kearney, and Mr. Porpora exchanging updates about Mandarin's claim and discussing Mr. Sullivan's advice about negotiating with Marsh and Mandarin.  Because these messages contain a mix of communications soliciting and providing legal advice, the ACP applies and they are properly redacted.

Accordingly, with respect to Exemplar 9, Defendants are directed to unredact and produce the Dec. 2020 Kearney Email and the Dec. 2020 Sullivan Emails.

### e.  Exemplar 10

Exemplar 10 is a series of emails dated in October 2022 between Mr. Sullivan, Mr. Lammond, Mr. Brown, and others concerning Mandarin's response to Defendants' request for additional information concerning its claim under the Policies, from which Defendants have redacted five emails.[9]  Each of the redacted emails reflects reactions to, legal advice concerning, or requests for legal advice in response to the additional information from Mandarin.  Because

---

[9] Generali000165-68.

these emails contain a mix of communications soliciting and providing legal advice, the ACP applies and they are properly redacted.

## IV. CONCLUSION

For the reasons set forth above, Mandarin's Motion is GRANTED IN PART and DENIED IN PART. On or before June 18, 2025, Defendants shall produce the following—and any similar communications and documents they have withheld as privileged—

(1) Documents and communications concerning reinsurance;

(2) Documents and communications concerning reserves;

(3) From Exemplar 6, the Sept. 15 Bianchi Email, the Sept. 16 Sullivan Email, and the Sept. 16 Kearney Email

(4) From Exemplar 7, the Dec. 2021 Lammond Email;

(5) From Exemplar 8, the Dec. 2021 Brown Email;

(6) From Exemplar 9, the May 2022 Brown Email; and

(7) From Exemplar 10, the Dec. 2020 Kearney Email and the Dec. 2020 Sullivan Email.

Dated:      New York, New York
            June 10, 2025

                                        SO ORDERED.

                                        SARAH L. CAVE
                                        United States Magistrate Judge